**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| RANDY L. PERRY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 17-2021 (TSC) |
| | ) |
| ROBERT WILKIE, SECRETARY, | ) |
| DEPARTMENT OF VETERANS | ) |
| AFFAIRS, | ) |
| | ) |
| Defendant. | ) |

_____)

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, Randy L. Perry, by and through his undersigned counsel, and hereby respectfully submits this memorandum in opposition to Defendant's motion for summary judgment.  In support of this opposition, the Court is respectfully referred to the documentary exhibits and Local Rule 7(h) statement of material facts in dispute. A proposed order consistent with this opposition is also attached.

## INTRODUCTION

Throughout his career in the Federal Government, including at the Defendant agency, Mr. Perry was an outstanding performer who received nothing but Outstanding performance ratings.  He had been accepted to and, in June 2016, graduated from, the highly selective and prestigious Eisenhower School of the National Defense University. He was in the top 25% of the class and received a performance rating of Outstanding from the School.  His future looked especially promising.  However, that changed once he began exercising his EEO rights on October 19, 2016.  His supervisors took a series of hostile actions against him culminating in a

lowered performance rating for FY 2016 (despite receiving an Outstanding for his work at the School during the first eight months of FY 2016). At about the same time, Mr. Perry was non-selected for a promotion to Management Services Officer, GS-15, despite being far more qualified than the selectee. Defendant offered no explanation whatsoever as to the experiences, skills or education on which the decision was made that the selectee was a superior candidate to Mr. Perry. The only apparent explanation, therefore, was that the selectee and selecting officials are African American whereas Mr. Perry is Caucasian.

Also, in the fall and winter of 2016, Mr. Perry's office was disbanding as part of a reorganization. On November 9, 2016, Mr. Perry received a Transfer of Function Notification notifying him that his position would transfer to another work unit and that he would retain his supervisory authority. His new supervisor, Martin Pellum, understood that Mr. Perry had to be placed in a supervisory position. However, upon learning of Mr. Perry's EEO activity from Mr. Perry's former supervisor, he removed Mr. Perry's supervisory authority. And, when he learned that Mr. Perry amended his EEO complaint to include this issue, Mr. Pellum contemplated downgrading Mr. Perry's position from GS-14 because it no longer was supervisory. Also, he refused to correct the loss of Mr. Perry's supervisory authority. Defendant's retaliatory treatment of Mr. Perry continued until he left Defendant to accept a position at another federal agency.

Defendant has essentially failed to articulate any legitimate, non-discriminatory reasons for lowering Mr. Perry's FY 2016 performance rating, not selecting him for promotion to Management Services Officer, or removing his supervisory function. Because a reasonable jury could conclude that the true reasons for Defendant's actions were unlawful discrimination and retaliation, summary judgment must be denied on all of Mr. Perry's claims.

## STATEMENT OF FACTS[1]

### Background

Mr. Perry is a 49-year old Caucasian male who currently is categorized as a 90% disabled Veteran.  Compl. ¶¶ 7-9.  He possesses an outstanding record of military and civilian employment in the Federal Government.  He entered the U.S. Army as an enlisted Logistics Soldier in 1997 where he served for three years and was promoted to the rank of SGT/E5 before he received his commission from the U.S. Army Officer Candidate School in 2000.  After successfully graduating from both the Officers Basic and Advanced Courses, Mr. Perry then served another seven years as an Army Logistics Officer.  Compl., ¶¶ 13-14; Plaintiff's Exhibit **(PEX) 13**, Resume of Randy L. Perry.

Afterwards, Mr. Perry served, among other roles, as principal logistics analyst and program manager in the private sector and as a Government contractor at the Pentagon.  Compl., ¶¶ 16-17.  Then, in November 2008, he served as a Program Manager, GS-13, for the Army.  There, Mr. Perry served as the policy and technical expert on logistics and logistic system integration and analysis.  As a program manager, Mr. Perry developed programs, projects and plans that supported and promoted integration of joint logistics management and information systems.  Compl., ¶ 17.  While at the Army as a GS civilian, Mr. Perry consistently received performance ratings of Outstanding. Compl. ¶ 18; **PEX 14,** Mr. Perry's Appraisals from the Army.

### Mr. Perry's Employment at Defendant and Acceptance into and Performance at the Eisenhower School

---

[1] The factual recitation herein serves as a summary of the Plaintiff's Further Statement of Facts asserted in Mr. Perry's Rule 7(h) statement. Mr. Perry incorporates any facts and citations enumerated in his Rule 7(h) statement and not included in this summary.

On March 11, 2013, Mr. Perry left the Army to accept a promotion at Defendant agency to GS-14 Program Analyst, Strategic Management Group ("SMG"), Office of Human Resources and Administration ("HR&A"). Compl., ¶ 19.  On or about December 29, 2013, Dr. George Tanner, then Dean of the VA Learning University ("VALU"), recruited Mr. Perry to VALU.  At first while he was at VALU, Mr. Perry reported directly to Dr. John Garvin, then Director, Leadership Development Directorate (LDD), as his operations officer.  When Dr. Garvin left VALU in 2014, some VALU employees approached Dr. Tanner and recommended that Mr. Perry be named to backfill Dr. Garvin.  Compl., ¶ 19.

On June 2, 2014, Mr. Perry became Supervisory Deputy Director, LDD, VALU.  Compl., ¶ 20.  From November 2014 to April 2015, Mr. Perry served as the Acting Director in addition to his assigned Deputy duties for LDD, VALU, in effect, wearing "two hats." Compl., ¶ 21.

While at the VA, Mr. Perry continued to receive annual performance ratings of Outstanding until December 2016.  Compl., ¶ 22**; PEX 15**; **PEX 16,** Mr. Perry's FY 14 and 15 Performance Appraisals.  Further evidence of Mr. Perry's outstanding performance was his acceptance into the prestigious Dwight D. Eisenhower School for National Security and Resource Strategy ("Eisenhower School") of the National Defense University (NDU).  Compl. ¶ 24**; PEX 17,** Recommendation letter of George L. Tanner, Ph.D.  The Eisenhower School is exceptionally selective.  At the VA, the selection process is especially meticulous in that only two people across the entire agency are selected for the Eisenhower School per year. For the 2015-2016 academic year, Mr. Perry was number one of only three VA-wide employees (including one alternate) selected to attend.  Compl. ¶¶ 26 and 27; **PEX 1**, Excerpts from Transcript of Deposition of Randy L. Perry (August 29, 2018), at 55:9-55:15; 136:21-136:22;

137:5 – 137:15; **PEX 4**, Excerpts from Transcript of Deposition of John Garvin, at 19:6 – 20:10;

43:1 – 43:8.

Mr. Perry attended the Eisenhower School from August 3, 2015, until graduation on June

9, 2016.  **PEX 1**, at 18:25 – 19:1; 53:4 – 53:9.  During that time, Dr. Tanner appointed two

employees, Jesse Hawkins and Rhonda Carter, to act in Mr. Perry's place as co-Deputy Directors

of LDD at VALU.  Compl. ¶ 33.

At the Eisenhower School, Mr. Perry's primary faculty advisor was Dr. Garvin, who had

been Mr. Perry's supervisor at VALU in 2014.  **PEX 1**, at 59:11 – 60:4; **PEX 4**, at 18:7 – 18:22.

Ms. Terri Cinnamon, when she was Mr. Perry's first level supervisor at VALU, did not place Mr.

Perry under performance standards for FY 2016 while he was at the Eisenhower School. **PEX 1**,

at 90:4 – 91:16; 93:12 – 93:24; **PEX 2**, Excerpts from Transcript of Deposition of Randy L. Perry

(September 12, 2018), at 69:3 - 69:16; **PEX 7**,  Email chain Re: VA From [sic] 0750

Performance Plan Signature Request, with dates October 29, 2015, and July 19, 2016.  Instead,

Mr. Perry was placed on Eisenhower School and NDU academic and conduct standards.  Where

Mr. Perry's VA standards had lapsed and where there was no communication from the VA that

they had other standards they wanted applied to Mr. Perry, Eisenhower/NDU standards applied

exclusively.  Mr. Perry's performance appraisal from the Eisenhower School "is based

completely off of the Eisenhower standards."  **PEX 4**, at 25:8 – 25:10; .63:15 – 64:20.

Mr. Perry received a performance appraisal for his ten months at the Eisenhower School

from Brigadier General Thomas A. Gorry.  The appraisal began with:  "Mr. Randy L, Perry was

an *outstanding* Veteran Affairs student at ES, National Defense University, for the year 2015-

16." (Emphasis added).  The appraisal went on to praise Mr. Perry for his outstanding leadership

and communication skills, his extensive knowledge base, and his contributions to the academic

year.  According to Dr. Garvin, Mr. Perry was a star pupil who did very well in logistics and was

in the top 25% of his class.  Compl. ¶ 28; **PEX 8**, Excerpts from Transcript of Deposition of

Harry Wilkes, at 42:7 – 42:9; **PEX 4**, at 35:12; **PEX 3**, Mr. Perry's Eisenhower School

Performance Appraisal.

Mr. Perry's Return from the Eisenhower School

The Eisenhower School's post-graduate ten-month academic program is designed to

prepare students for future careers as strategic leaders.  Graduates of the School from the VA are

expected to be placed in senior leadership positions at strategic levels upon graduation.  The

expectation is that the graduate will go back to a developmental assignment with greater

responsibility than the position they had been in previously.  Compl. ¶¶ 30-31; **PEX 3**;  **PEX 1**,

at 139:13 – 139:14; **PEX 4**, at 44:3 – 44:18; **PEX 5**, Excerpts from Transcript of Deposition of

George Tanner,  at 53:21- 54:3.**PEX 18**, Eisenhower School Brochure.

However, the VA and Dr. Tanner failed in their responsibilities to make appropriate

placements for Mr. Perry and the VA's other two Eisenhower School graduates.  Compl. ¶ 32**;**

**PEX 1**, at 55:3 – 55:8; 55:16 – 57:11; 98:1 – 98:12; 100:19 – 102:24; 103:21 – 104:9.   After Mr.

Perry graduated, he went on leave until after the 4th of July.  **PEX 1**, at 95:16 – 95:17.  After that,

Mr. Perry began a detail reporting to James Stolarski, Senior Advisor to the Undersecretary for

Health, as the Program Manager for the Critical Staffing Initiative.  Mr. Perry did not receive any

performance standards from Mr. Stolarski, who as a consultant hired by the Agency pursuant to

5 U.S.C. **§** 3109[2]**,** lacked authority to write performance standards, supervise employees or rate

---

[2] Under 5 U.S.C. § 3109, federal agencies may appoint experts or consultants as needed for temporary or
intermittent work.  Under the statute, agencies may not appoint experts or consultants to do work that is continuous,
full-time, and that is the responsibility of regular employees.  It is illegal for section 3109 employees "to perform
managerial or supervisory work . . .  or to otherwise function in the agency chain of command (e.g., to approve
financial transactions, personnel actions, etc.)."  5 C.F.R. § 304.103(b)(3).

their performance.  The detail lasted approximately three months.  Compl. ¶¶ 43-45; **PEX 19**, Email from Jim Stolarski, dated August 3, 2016; **PEX 1**, at 149:7-150:8; 158:3 – 158:6; **PEX 8**, at 79:12 – 79:20.

Martin Holland became the Deputy Dean for VALU shortly before Mr. Perry left for the Eisenhower School, and had not been part of Mr. Perry's supervisory chain.  **PEX 1**, at 65:11 – 65:24.  In July 2016, after Mr. Perry's graduation from the Eisenhower School, Mr. Holland harassed and bullied Mr. Perry in an attempt to force him to sign retroactive and back-dated performance standards that had nothing to do with any of the work Mr. Perry performed during the FY 2016 rating period.  Compl., ¶¶ 35-36; **PEX 1**, at 145:12 – 145:25.  Realizing that his discussions with Mr. Holland were not productive, Mr. Perry suggested the alternative course of action of leaving his performance standards for FY 2015 in place for FY 2016.  Mr. Holland agreed to that.  Mr. Perry signed a document with those standards on July 28, 2016.  **PEX 1**, at 147:22 – 148:21.   Mr. Holland marginalized Mr. Perry's accomplishments at the Eisenhower School and told Mr. Perry that he would be preparing his performance appraisal for FY 2016 even though Mr. Perry had not worked for Mr. Holland for even a single day of the appraisal period.  Compl. ¶39; **PEX 1**, at 172:23- 173:9; **PEX 20**, Memorandum from Mr. Perry to Pamela Mitchell dated August 2, 2016.

On August 2, 2016, Mr. Perry reported Mr. Holland's actions to Pamela Mitchell, Dr. Tanner's immediate supervisor and the Principal Deputy Assistant Secretary (PDAS), HR&A.  At a meeting on the same day, PDAS Mitchell decided that Terry Mintz, Executive Director for HR&A, would rate Mr. Perry's performance.  In addition, PDAS Mitchell decided that both she and Mr. Mintz would instruct Mr. Holland to have no further contact with Mr. Perry about his performance standards.  Compl., ¶ 40; **PEX 1**, at 149:13-19; **PEX 20.**

On September 9, 2016, Mr. Holland disobeyed PDAS Mitchell's instruction by requesting a meeting with Mr. Perry to discuss his performance standards.  After Mr. Perry objected, Mr. Holland referred the matter back to Mr. Mintz who then told Mr. Holland that Mr. Wilkes was taking his place.  Compl. ¶ 41; **PEX 23**, Email chain among Mr. Perry. Mr. Holland, Mr. Mintz, and Mr. Wilkes, dated September 9, 2016.  However, Mr. Wilkes took Workmen's Comp leave beginning on September 16, 2016, and "the next thing [he] know[s] it's Marty." **PEX 8**, at 72:4 – 72:14; 77:13 – 77:17.

<u>Mr. Perry's Protected Activity and the Start of Defendant's Reprisal</u>

On October 19, 2016, Mr. Perry initiated contact with an EEO Counselor at the VA's Office of Resolution Management ("ORM") and had his first meeting with her the next day. **PEX 25**, Counselor Report on Case No. 2004-0006-2017100366.

On November 1, 2016, Dr. Tanner, in an attempt to damage Mr. Perry's reputation for integrity, falsely accused him, in an email he sent to Mr. Perry and PDAS Mitchell, of evading the accepted procedure for requesting leave and thereby creating a "perception of impropriety". Dr. Tanner did this as soon as he learned that Mr. Perry initiated the EEO process.  The following excerpt from Dr. Tanner's email reveals that Dr. Tanner's purpose in sending this email was to retaliate against Mr. Perry for initiating the EEO process:

> In order to protect them [subordinates] and you from any perception of impropriety, you will need to submit your requests and receive approval of time off from your supervisory chain.  I understand that there appears to be an issue with your immediate supervisor Marty Holland that you have requested ORM to assistance. [sic]  So you know, I have not yet received a grievance notification from ORM but I understand from a discussion with Tracey Therit that it is being processed and assigned sometime this week.

Dr. Tanner does not recall ever having sent PDAS Mitchell an email about any other employee purportedly not following leave procedures. Compl. ¶ 49; **PEX 1**, at 192:1 – 192:19; **PEX 5**, at 72:9 – 72:14; 77:19 – 78:1; **PEX 11**, Email from Dr. Tanner, dated November 1, 2016.

On November 9, 2016, Dr. Tanner sent Mr. Perry an email which ended with an acknowledgement that Mr. Perry had followed proper leave procedures after all and that his November 1 email had been in error.  Dr. Tanner did not include PDAS Mitchell on this email thereby leaving her with the false impression that Mr. Perry created a "perception of impropriety". **PEX 26**, Email from Dr. Tanner, dated November 9, 2016.

On November 10, 2016, at 3:56 p.m., Dr. Tanner wrote an email to Mr. Perry in which he stated "I acknowledge that you have filed a grievance with ORM, and that you have obtained legal counsel."  With that, Dr. Tanner was acknowledging that Mr. Perry filed an EEO complaint.  Only 12 minutes later, at 4:08 p.m., Dr. Tanner, in another attempt to damage Mr. Perry's reputation, forwarded his email to PDAS Mitchell and wrote the following:

> You should know that I am concerned about Randy.  Randy returned to VALU
> last Monday but he doesn't seem to want to engage with his LDD section.  From what I
> see, and what I hear from his section members, he appears to be opting to stay in his
> office behind a closed door most of the time.  In my opinion, his behavior is different
> than what it was in the past; more erratic, unfocused and surly.  I can't yet judge his
> performance, but in my opinion, he doesn't appear to be doing very much at work to earn
> his paycheck.

As to "what I hear from his section members," Dr. Tanner cannot recall a single person from whom he allegedly heard about concerns over Mr. Perry's behavior "because it is almost two years ago" even though he recalled events dating further back.  **PEX 27**, Email chain among Mr. Perry, Dr. Tanner, Ms. Mitchell, and others, dated November 10, 2016, at 0000135-136; **PEX 5**, at 134:18 – 135:19; 139:10 – 139:22.

Dr. Tanner's statements to PDAS Mitchell about Mr. Perry were intentionally false.  Mr. Hawkins, who worked with Mr. Perry on a daily basis after he returned to VALU, testified that it was untrue that Mr. Perry did not engage.  According to Mr. Hawkins, "Randy worked.  That's the bottom line.  Randy did his job."  Mr. Hawkins also testified that "What I saw was Randy

being fully engaged and doing his job.  Randy did not skip a beat" and that there was no "erratic" or "unfocused" conduct by Mr. Perry. Mr. Hawkins, whose office was next door to that of Mr. Perry, was able to observe him on a regular and continuing basis.  By contrast, Dr. Tanner's office, in relation to Mr. Perry's office, was on the other side of the building from which, "by no means, form or shape" could he see what Mr. Perry was doing. And, as an SES employee, Dr. Tanner "wouldn't know what Randy was doing."  Nor did Dr. Tanner ever speak with Mr. Hawkins about Mr. Perry's conduct after he returned to VALU.  **PEX 6**, Excerpts from Transcript of Deposition of Jesse Hawkins, at 40:25 – 41:6; 43:15 – 43:18; 44:5 – 45:4; 51:20 – 51:23; 57:10 – 57:18.

When his informal complaint was not resolved, Mr. Perry filed a formal complaint on November 21, 2016.  Compl. ¶ 50; **PEX 28**, Formal Complaint dated November 21, 2016.

<u>Mr. Perry's Lowered Performance Rating</u>

On December 9, 2016, Mr. Holland gave Mr. Perry a mid-year review of his performance for the performance period that had ended on September 30, 2016.  Mr. Holland signed the mid-year review as Mr. Perry's Rater and identified Dr. Tanner as Mr. Perry's Approval Official. Compl. ¶ 52.  On December 13, 2016, only two work days after the mid-year review, Mr. Holland gave Mr. Perry a rating of only "Excellent" even though Mr. Perry had received what was plainly an "Outstanding" rating from the Eisenhower School.  Although Mr. Holland rated Mr. Perry as "Exceptional" in all five of his critical elements, without any explanation whatsoever, Mr. Holland rated Mr. Perry only "Fully Successful" in all three of his non-critical elements, resulting in an overall rating of "Excellent."  Compl. ¶¶ 53 and 54.

Essentially, Mr. Holland rewrote the appraisal that Mr. Perry received from the Eisenhower School.  Dr. Garvin, who had been Mr. Perry's Primary Faculty Advisor, drafted the

appraisal for Brigadier General Gorry's signature, knew definitively that the appraisal was that Mr. Perry's performance was "Outstanding," and that he performed "Outstanding," not merely "Fully Successful," in all three of his non-critical elements. Compl. ¶¶ 53 and 54; **PEX 2**, at 71: 6 – 71:10; **PEX 4**, at 24:14 – 25:1; 30:18-30:21; 33:9 – 34:15; **PEX 3**; **PEX 9,** at p. 6, Section E.

Mr. Perry's "Outstanding" rating from the Eisenhower School should have been his rating for FY 2016 because it covered eight months of the rating period.  While a student attends the Eisenhower School, it is the primary faculty advisor who is responsible for the student's performance standards.  Moreover, during FY 2016, Mr. Perry had not worked at VALU for a single day.  **PEX 1**, at 107:13 – 107:14; **PEX 8**, at 74:7 – 74:18; 105:18 – 105:22; **PEX 5**, at 82:2 – 82:21.

Mr. Holland signed Mr. Perry's FY 2016 appraisal not as Rater but, instead, as Approval Official.  Dr. Tanner could offer no explanation as to why his subordinate, Mr. Holland, designated himself as Rater on December 9, 2016, and only two business days later, re-designated himself as Approval Official, which had been Dr. Tanner's role.  **PEX 5**, at 90:9 – 90:22; 93:8 – 93:15.  When Mr. Perry attempted to grieve the appraisal to Dr. Tanner, who had been Mr. Perry's actual Approval Official, Dr. Tanner rejected the request and instructed Mr. Perry to submit it to Mr. Holland so that he could review his own performance rating.  **PEX 2**, at 15:14 -15:20; 70:7 – 70:13;  **PEX 30**, Email chain re 2016 Annual Performance Appraisal – Informal Grievance Appeal, dated December 16, 2016.   In FY 2016, Mr. Holland designated himself as Rater for employees other than Mr. Perry for whom he prepared performance appraisals. **PEX 6**, at 24:20-25:1; 26:19 – 27:1; **PEX 5**, at 87:13 – 88:14; 89:12 – 18;  **PEX 31**, FY 2016 Performance Appraisal for Mr. Hawkins, at page marked "Page 5 of 6";  **PEX 32**, FY 2016 Performance Appraisal for Victor Geary, at page marked "Page 5 of 10.".

Under the VA's written procedures for Performance Management Systems, the Approval Official must be at a higher management level than the Rater and, thus, the same official cannot be both an employee's Rater and his Approval Official.  In other words, a Rater cannot review his own rating of an employee.  As Dr. Tanner admitted during his deposition, Mr. Holland should have signed Mr. Perry's appraisal as the Rater, and Dr. Tanner, not Mr. Holland, was the Approval Official.  **PEX 33**, Excerpts from VA Handbook 5013/13 – Performance Management Systems – Part I.  Title 5 Performance Appraisal Program, at I-3; **PEX 5**, at 95:15 95:22; 96:11 – 96:18.

Also, under the VA's written procedures, an employee's grievance of his performance appraisal first goes to his Approval Official, who, for Mr. Perry, was Dr. Tanner.  If the employee is not satisfied with his Approval Official's decision, he may then appeal it to the management official at the next higher level in the organization who, in Mr. Perry's case, was PDAS Mitchell.  Dr. Tanner does not, and cannot, deny that what happened with Mr. Perry's FY 2016 appraisal was inconsistent with what should have happened under written VA policy. **PEX 33**, at I-6; **PEX 5**, at 97:8 – 97:16; 98:8 – 98:10; 100:3 – 100:8.  To ensure that a reviewer outside of VALU would have no opportunity to correct their retaliatory lowered rating of Mr. Perry, Mr. Holland and Dr. Tanner side-stepped the VA's standard operating procedures.

On December 16, 2016, Mr. Perry submitted an informal grievance to Dr. Tanner, in accordance with VA policy.  In his informal grievance, Mr. Perry listed ten reasons why Mr. Holland's appraisal was defective and why Mr. Perry's rating should have been "Outstanding".  Among the reasons Mr. Perry provided were that VALU performance standards were used even though Mr. Perry spent most of FY 2016 at the Eisenhower School, his "Outstanding" rating from the Eisenhower School was reinterpreted as merely "Excellent," his detail with Mr.

Stolarski should not have been factored in because of Mr. Stolarski's lack of supervisory authority (Mr. Stolarski was essentially a peer), and Mr. Perry was not given an opportunity to submit a self-assessment.  **PEX 30**.

On December 21, 2016, Mr. Holland responded to Mr. Perry's informal grievance with a summary denial that did not acknowledge a single one of Mr. Perry's ten objections.  Then, Mr. Perry filed a formal grievance.  On December 23, 2016, Dr. Tanner responded to Mr. Perry's formal grievance by making the false claim that Mr. Perry's objections "contained mostly personal statements attacking the character and professional competency" of Mr. Holland and Mr. Stolarski.  **PEX 34**, Memorandum dated December 21, 2016, from Mr. Holland to Mr. Perry; **PEX 35**; Memorandum dated December 23, 2016, from Dr. Tanner to Mr. Perry**; PEX 5,** at 111:14 – 111:17; 123:15 – 125:6; 129:11 – 130:6.  Neither Mr. Holland nor Dr. Tanner stated a legitimate, non-discriminatory reason for lowering Mr. Perry's FY 2016 rating despite his Outstanding rating from the Eisenhower School.

Mr. Hawkins and Ms. Carter, both of whom assumed Mr. Perry's duties on a full-time basis while he was at the Eisenhower School, each received a rating of "Outstanding" from Mr. Holland whereas Mr. Perry received a rating of only "Excellent".  Both Mr. Hawkins and Ms. Carter are African American and, as of December 2016, had not engaged in any EEO activity. **PEX 31**; **PEX 6**; **PEX 36**, Redacted List of FY 16 Performance Ratings from Mr. Perry's Section.  For FY 2016, three employees in Mr. Perry's work group, Ms. Carter, Mr. Geary and Mr. Hawkins, were the only employees to receive a rating of Outstanding.  All three are African American.  **PEX 36**; **PEX 31**; **PEX 32**.[3]

---

[3] The list of FY 16 appraisals for Mr. Perry's office, found in the Report of Investigation prepared by the Agency, **PEX 36**, omits Mr. Hawkins' rating and erroneously lists Mr. Geary's rating as "Excellent."

Even under Mr. Holland's performance standards, Mr. Perry's performance should have been rated "Exceptional" in all three of the elements in which Mr. Holland rated him only "Fully Successful".  Those three elements are:  Influencing/Negotiation (Element 6); Organizational Planning (Element 7); and Supervisory Development and Technical Training (Element 8).  According to Dr. Garvin, who had been Mr. Perry's supervisor at LDD before becoming his primary faculty advisor at the Eisenhower School, all of Mr. Perry's coursework demonstrated performance in Elements 6, 7, and 8, and he had performed in an outstanding manner as to all of these elements. **PEX 4**, at 29:2 – 30:25; **PEX 9**.

For example, as for Element 8, pertaining to supervisory and technical training, Mr. Holland rated Mr. Perry only "Fully Successful" even though, during the rating period, Mr. Perry had earned a Master of Science degree in National Resource Strategy at the Eisenhower School, with a GPA of 3.53, and was close to completion on a Master of Business Administration at Strayer University, where he graduated with a grade point average of 4.0.  The coursework involved in both Master programs was directly relevant to Mr. Perry's work at the Agency.  **PEX 2**, at 75:7 – 76:19.  **PEX 8**, at 58:11 – 59:19; **PEX 4**, at 29:2 – 30:25; **PEX 37**, Mr. Perry's Transcript at the Eisenhower School.

VA employees with higher ratings of record must receive a performance award at a higher dollar amount than VA employees with lower ratings of record.  For example, a GS-5 with an outstanding rating must receive a higher dollar amount than a GS-5 who received a highly successful rating. **PEX 38**, Excerpt from VA Handbook 5017/9 – Employee Recognition and Awards (July 7, 2010).  For VALU employees receiving performance appraisals for FY 2016, the award for an Outstanding rating was $765.00 and 24 hours of time off, whereas for

employees receiving an Excellent rating, the award was $515 and 16 hours of time off.  **PEX 39**,

Email from George Tanner to VALU Directors, dated January 6, 2017.

<u>Mr. Perry's Non-Selection for Management Services Officer, GS-15</u>

During the summer of 2015, Sam Retherford, then PDAS, HR&A, announced at a

teleconference meeting with VALU leadership that Mr. Perry would be attending the Eisenhower

School and that he would be a good fit for the Management Services Officer GS-15 position.

**PEX 1**, at 53:22 – 54:10; **PEX 8**, at 23:17 – 23:19.  Mr. Perry applied for the position.

According to the job posting, the specific responsibilities involve "Providing efficient, timely,

and cost effective support services to all VA Central Office (VACO) to include the Office of the

Secretary, Departments, and Staff Offices located in VACO and the outlying campus buildings

in the Washington DC metropolitan area."  The specialized experience required for the position

includes:

> Providing a wide variety of administrative services in support of efficient operations of a
> business or program office; analyzing work functions and processes and identifying
> process improvements; planning and coordinating budget and financial plans and
> operations; developing and formulating alternative solutions to administrative matters
> and utilizing computer and automation systems in support of administrative functions;
> and experience with Interagency Agreements with other federal agencies and contracts
> with private vendors in providing support to the Service's clients.

Compl. ¶ 55; **PEX 40**, Vacancy Announcement for Management Services Officer position.

Mr. Perry was interviewed for the position by a panel on or about November 30, 2016.

Compl. ¶ 56.  Only Mr. Perry and Eric Whitehurst were invited for second interviews.  The

second-round interview was a 30-minute meet-and-greet with Laura Akinselure and Roy

Hurndon on December 8, 2016.  Ms. Akinselure, Mr. Hurndon, and Mr. Whitehurst are all

African American. Compl.¶ 57; **PEX 1**, at 225:14 – 225:16; **PEX 2**, at 64:3 – 64:5.  Before the

second-round interviews took place, Mr. Hurndon walked Mr. Whitehurst through the Office of

Administration and introduced him as the new Management Services Officer. Compl. ¶ 58; **PEX 10**, Affidavit by Interrogatories of Randy Perry, dated June 9, 2017, at 000094.

Unlike Mr. Perry, Mr. Whitehurst was not selected for the Eisenhower School or any of the other five NDU schools.  Nor would Mr. Whitehurst have been qualified to attend the schools because of his lack of civilian management experience in the Federal Government. Compl. ¶¶ 60 and 61; **PEX 1**, at 205:10-205:15; 205-21- 206:12; 210:23- 211:4; **PEX 2**, at 77:3 – 77:10; **PEX 18**; **PEX 41**, Eric Whitehurst Resume.  At the time Mr. Whitehurst was selected, he was responsible for one of the smallest portfolios in SMG.  By contrast, Mr. Perry was the lead program manager for VALU, which had the largest and most complex portfolio within SMG, with 29 projects worth approximately $80 million annually Compl. ¶ 62; **PEX 1**, at 206:24 – 207:13; **PEX 42**, Written Statement of Joseph Viani.

Joseph Viani, former SES Director of SMG, supervised both Mr. Perry and Mr. Whitehurst and gave his "highest unconditional recommendation" to Mr. Hurndon that he select Mr. Perry. Mr. Viani found it "odd" that Mr. Whitehurst was selected over Mr. Perry for Management Services Officer.  Compl. ¶¶ 63-64; **PEX 42**.  Mr. Wilkes was Mr. Viani's Deputy Director for SMG during this time frame and worked with both Mr. Perry and Mr. Whitehurst. In Mr. Wilkes' opinion, based on his daily observation as the SMG Deputy Director, Mr. Perry was far more qualified for the Management Service Officer position than Mr. Whitehurst.  As to the position, itself, "[i]t was basic logistics, it was Randy."  **PEX 8**, at 10:13 – 10:17; 105:13 – 105:17.

Mr. Hurndon's familiarity with Mr. Whitehurst, based on the latter's work as a portfolio manager, did not qualify Mr. Whitehurst for Management Services Officer, which is not a portfolio management position but, instead, a management services position.  Management

Services Officer is a facility logistics job, and facilities logistics and portfolio management are two different jobs.  Unlike Mr. Whitehurst, Mr. Perry had all of the logistical skill sets to fit the billet.  **PEX 1**, at 205:1 – 205:8; 206:19-206:23; 208:17-210:1; **PEX 8**, at 81:2 – 81:12; **PEX 40**. By contrast, from 2014 until his selection for Management Services Officer, Mr. Whitehurst was a portfolio program manager who did no work in facility logistics.  DEX 3, pp. 90:4 – 91:13.

From January 1, 2014, through August 27, 2018, Ms. Akinselure was the selecting official for four GS-15 or SES positions, including Management Services Officer.  Three of her selections were African American and one was Caucasian.  For the same period, Mr. Hurndon was the selecting official for one SES position, and he selected Ms. Akinselure, who is African American.  **PEX 24**, Excerpts from Agency's Responses and Objections to Plaintiff's Second Set of Interrogatories, at 1-2; **PEX 43**, Defendant's Supplemental Responses to Plaintiff's Interrogatories, at 1-2.

Apart from their statements that Mr. Whitehurst received the highest cumulative score from the Best Qualified and interview processes (Mr. Perry and Mr. Whitehurst tied at 47 points in the Best Qualified process.  See DEX 6, at 000555), neither Ms. Akinselure not Mr, Hurndon offered any explanation whatsoever as to why they selected Mr. Whitehurst over Mr. Perry. **PEX 44**, Affidavit of Interrogatories by Mr. Hurndon, at 000177; **PEX 45**, Affidavit of Interrogatories by Laura Akinselure, at 000183. Had the sum of the Best Qualified and interview scores been the true basis for the selection of Mr. Whitehurst over Mr. Perry, then Martha Ramirez, who received the second highest cumulative score of 44/312 (to Mr. Perry's 47/302), would have been invited for a second interview along with Mr. Perry and Mr. Whitehurst. DEX 6, at 000554-5555.  She was not.

<u>Mr. Perry's Transfer from VALU and Removal of Supervisory Authority</u>

Mr. Perry learned on November 9, 2016, that through a reorganization, VALU would no longer exist as of January 9, 2017.  **PEX 1**, at 225:22 – 226:2; **PEX 46**, Transfer of Function Notification to Perry Randy [sic], dated November 9, 2016.  Mr. Perry's position was to transfer to the Veterans Health Administration, Healthcare Leadership Talent Institute (VHA/HLTI), and he would be reporting to Martin Pellum, the Director for Talent Assessment.  **PEX 46**; **PEX 47**. Excerpts from Transcript of Deposition of Martin Pellum, at 6:9 – 7:19; **PEX 1**, at 38:6 – 38:7.

By October 14, 2016, Mr. Pellum was aware that Mr. Perry was a supervisory GS-14 in VALU, and that he would need to be a supervisory GS-14 upon his reassignment to HLTI.  **PEX 48**, Email chain dated October 13 and 14, 2016; **PEX 49**, Email chain dated October 21, 2016; **PEX 47,** at 19:9 – 19:22.  Mr. Pellum reported directly to Denise Deitzen, who was to be Mr. Perry's second-level supervisor.  Lisa Red, Deputy Director for HLTI, and Bunny Huller also reported directly to Ms. Deitzen.  They, too, became aware that Mr. Perry would have to remain in a supervisory GS-14 position at HLTI.  **PEX 2,** at 38:8 – 38:9; **PEX 47**, at 6:18 – 6:19; 8:18 – 8:25; 10:8 – 10:16; 19:16 - 20:3.

On October 21, 2016, two days after Mr. Perry initiated EEO Counselor contact for his complaint against Dr. Tanner and Mr. Holland, Mr. Pellum told Ms. Huller that "The informal communication chain with VALU is that he [Mr. Perry] was not highly thought of there."  While denying that Dr. Tanner or Mr. Holland was the "informal communication chain," Mr. Pellum admitted that he cannot recall a single individual other than Dr. Tanner or Mr. Holland from whom he obtained this information, and he did have discussions with Dr. Tanner about the transfer of certain VALU employees' functions to HLTI.  Moreover, the information was false.  **PEX 49**; **PEX 47**, at 10:1 – 10:4; 18:1 – 18:6; 22:2-3; 57:16  57:21; 58:15 – 58:17; **PEX 6**, at

40:1 – 40:9; **PEX 5**, at 141:13 – 141:22.  The official in VALU who communicated with HLTI and Mr. Pellum about the transition from VALU to HLTI, including the reassignment of Mr. Perry, was Dr. Tanner.  Thus, he would have been the VALU official to discuss Mr. Perry with Mr. Pellum.  **PEX 48**; **PEX 47**, at 10:1 – 10:4; 18:1 – 18:6; 22:2-3; 57:16  57:21; 58:15 – 58:17; **PEX 5**, at 141:13 – 141:22.

On November 9, 2016, Mr. Perry received a Transfer of Function Notification (to Associate Director for Talent Assessment – Supervisory Program Analyst), GS-0343-14.  The Notification stated that Mr. Perry's supervisory position in VALU would "continue in identical form" in the new office, VHA/HLTI.  Mr. Perry was warned that his only options were to accept the transfer of function, retire, resign, or "[b]e separated through adverse action procedures." Compl. ¶ 66; **PEX 46**.  A signed organization chart dated October 20, 2016, shows Mr. Perry's new position as being assigned to supervise two FTEs. Compl. ¶ 67; **PEX 50**, HLTI Organization Chart, dated October 20, 2016; **PEX 47**, at 31:2 – 31:4.  On January 8, 2017, Mr. Perry was issued an SF-50 for the transfer of his Supervisory Program Analyst function from one location to another.  It reflected a transfer of unchanged, identical supervisory authority. Mr. Perry's position description (PD) was to remain PD 81314A.  Compl. ¶ 68; **PEX 51**, Mr. Perry's SF-50, effective date of January 8, 2017.   An organization chart dated January 18, 2017, showed Mr. Perry's position, Associate Director for Talent Assessment, as supervising five FTEs. Compl.¶ 69**; PEX 52,** HLTI Organization Chart Updated January 18, 2017.

Before the afternoon of January 31, 2017, Mr. Pellum had given Mr. Perry multiple verbal assurances that, as provided in his Transfer of Function Notification and the two organization charts for HLTI, Mr. Perry would retain his supervisory function.  On January 31, which was the first day of the HLTI Action Planning and Change Management Workshop, Mr.

Perry and Mr. Pellum had lunch together when they discussed what the next steps would be for the Talent Assessment Directorate after the Workshop concluded.  At no point during the lunch did Mr. Pellum tell Mr. Perry that his supervisory function was about to be taken away.  **PEX 12**, at 2; **PEX 47**, at 36:17-21; 43:16 – 44:1.

However, at the afternoon session of the Workshop immediately following the lunch, Mr. Pellum told everyone present that he would be rating everyone within HLTI, Talent Assessment. Mr. Perry learned for the very first time, in this public forum, that his position would be supervisory in name only and that the number of FTEs reporting to him would be zero.  This public announcement made Mr.  Perry feel misled, humiliated, professionally disrespected, and marginalized.  Compl. ¶ 71; **PEX 12**, at 2.

On Thursday, February 23, 2017, Mr. Perry put Mr. Pellum on notice that he amended his EEO complaint to include this sudden and completely unexpected removal of his supervisory authority.  **PEX 12**, at 2.  On Tuesday, February 28, 2017, only three work days later, Mr. Pellum wrote to Brenda McCoy, an HR Specialist, that he was starting work on Mr. Perry's PD and that "[i]f [Mr. Perry] is not a supervisor, I do not think he will stay as a 14."  In the same email, in addition to revealing a retaliatory plan to demote Mr. Perry after already taking away his supervisory authority, Mr. Pellum went on to unjustly accuse Mr. Perry of not making any significant accomplishments and "that does not seem to even phase [Mr. Perry] one bit."  **PEX 54**, Email from Martin Pellum to Brenda G. Harris, dated February 28, 2017; **PEX 47**, at 46:13.

On March 2, 2017, Mr. Perry proposed mediation to resolve the dispute over the removal of his supervisory authority.  Mr. Pellum rejected that proposal and neither he nor Ms. Deitzen would do anything to correct the situation and restore Mr. Perry's supervisory authority.  Compl.

¶ 72; **PEX 55**, Email chain dated March 2 and 12, 2017, between Mr. Perry and Mr. Pellum;

**PEX 47,** at 55:12 – 55:14.

Mr. Perry, despite his record of outstanding performance at the VA and the Eisenhower

School, was never placed in either a GS-14 or GS-15 supervisory role during the remainder of

his time at the VA.  Instead, he was placed on several details.  **PEX 2**, at 77:1-77:23; **PEX 56**,

Memorandum dated April 26, 2017, re:  Detail of Randy L. Perry to the Office of Academic

Affiliations; **PEX 57**, Memorandum dated June 23, 2017, re:  Termination of Detail of Randy L.

Perry to the Office of Academic Affiliations.  Paula Molloy, then Assistant Deputy Under

Secretary for Health for Workforce Service, and then Mr. Perry's third-level supervisor, had

assumed responsibility for placing Mr. Perry into a suitable new permanent position.  However,

she had left the VA by December of 2017.  **PEX 1**, at 38:10-39:4; **PEX 2**, at 78:11 – 78:17.

**PEX 58**, Memorandum dated June 26, 2017, from Dr. Molloy to Mr. Perry re:  Assignment to

HLTI.  Jessica Bonjorni replaced Dr. Molloy.

At this point, it became all too clear that Defendant's reprisal against Mr. Perry

continued.  Despite numerous efforts by Mr. Perry to meet with Ms. Bonjorni to discuss his

placement in a supervisory GS-14 or GS-15 position, she took no steps to find such a position

and would not speak with him.  While Mr. Perry was waiting for months for a placement, he was

forced to sit in an intern's cubicle, even though office space was available, where he felt isolated

and alienated. Mr. Perry was the only GS-14 employee in the work area who was not working in

an office.  **PEX 2**, at 78:20 – 79:20; 81:4 – 81:17.

Ms. Bonjorni knew that Mr. Perry had filed an EEO complaint.  That became apparent

when on May 7, 2018, Mr. Perry was at a meeting scheduled at the request of David Perry, who

worked for Ms. Bonjorni.  At the meeting, David Perry said it was brought to his attention that

Randy Perry was not under performance standards.  David Perry then told Randy Perry that if he did not immediately accept a 120-day detail as a GS-14 non-supervisory Program Analyst at Business Operations, either he could resign or be terminated.  Mr. Perry was given an arbitrary deadline of Sunday, May 13, even though he had been waiting in an intern's cubicle for the past five months to be placed in an appropriate supervisory position.  Randy Perry told David Perry that he had already performed this work at the Agency five years ago and that he was now a Supervisory Program Analyst.  David Perry told Randy Perry that any future promotion to GS-15, through Schedule A or otherwise, "was never going to happen."  **PEX 2**, at 80:5 – 80:25; **PEX 59**, Email from Mr. Perry to Arlene Adedeji, dated June 22, 2018.

The Agency neglected to place Mr. Perry under performance standards in 2017 and 2018, and gave him no performance appraisals for those years.  **PEX 1**, at 39:10 – 39:25. Realizing that any future at the VA would be a future of career purgatory and hostile work environment, Mr. Perry left the Agency to start in a new position at the Transportation Security Agency on September 4, 2018, as Logistics Management Specialist at a grade equivalent to GS-15, to include a 6% raise.  **PEX 1**, at 217:17 – 218:5.

## ARGUMENT

### I.    Legal Standard for Motions for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that a district court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." There is a genuine issue as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). The court, therefore,

"should review all of the evidence in the record," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000), viewing the evidence in the light most favorable to the non-moving party and according that party the benefit of all reasonable inferences. *Anderson*, 477 U.S. at 255.

At this stage of the proceedings, the court is not to make credibility determinations or weigh the evidence. *Reeves*, 530 U.S. at 150. If the evidence presented on a dispositive issue is subject to conflicting interpretations or reasonable persons might differ as to its significance, summary judgment is improper. *TSC Industries, Inc. v. Northway, Inc*., 426 U.S. 438, 450 (1976). Only if, after examining the evidence, the court finds that a party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," is summary judgment appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Jackson v. Finnegan*, 101 F.3d 145, 150 (D.C. Cir. 1996). Because summary judgment is a "drastic remedy," it "will only be granted in clear cases." *Greenberg v. Food & Drug Admin*., 803 F.2d 1213, 1216 (D.C. Cir. 1986) (citation omitted).

## II.    Summary Judgment in Employment Discrimination Cases

In *McDonnell Douglas Corp. v. Green*, the Supreme Court articulated a burden shifting paradigm to evaluate evidence of employment discrimination. 411 U.S. 792 (1973). First, the plaintiff establishes a *prima facie* case that raises an inference of discrimination. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 and n.44 (1977).

A plaintiff makes out a prima facie case of disparate-treatment discrimination by establishing that: "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."

*George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005).  One way a plaintiff can satisfy this third

prong is to show he was treated differently from similarly situated employees who are not part of

the protected class. *Id*.  But, this is not the only way.  A plaintiff can also establish an inference

of discrimination by showing that the adverse employment action is not attributable to the most

common legitimate reasons for such an action.  *Id*. at 412-413.

Once the plaintiff makes out a prima facie case, then the burden shifts to the defendant to

articulate a legitimate, non-discriminatory reason for the adverse action. *Texas Dept. of Cmty.*

*Affairs v. Burdine*, 450 U.S. 248, 254 (1981). If the defendant fails to articulate such a reason,

summary judgment must be denied and a jury must decide whether to believe the plaintiff's

evidence. *Id.* at 254 ("If the trier of fact believes the plaintiff's evidence, and if the employer is

silent in the face of the presumption, the court must enter judgment for the plaintiff because no

issue of fact remains in the case."); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 528 (1993)

("proof of a prima facie case not only raises an inference of discrimination; in the absence of

further evidence, it also creates a mandatory presumption in favor of the plaintiff. Although the

employer bears no trial burden at all until the plaintiff proves his prima facie case, once the

plaintiff does so the employer must either respond or lose.") (internal citations omitted).

## III.     Summary Judgment in Reprisal Cases

To make out a prima facie case of retaliation, a plaintiff must show that "(1) he engaged

in protected activity; (2) he was subjected to an adverse employment action; and (3) there was a

causal link between the protected activity and the adverse action." *Hamilton v. Geithner*,

666 F.3d 1344, 1357 (D.C. Cir. 2012) (citation omitted). For purposes of establishing a prima

facie case of retaliation, temporal proximity can support an inference of causation when the

protected activity and the adverse action are very close in time.  *Id*.

**IV.     Summary Judgment is not Appropriate on Plaintiff's Performance Appraisal Claim Because a Reasonable Jury Could Find that Defendant Lowered Plaintiff's Rating Because of his Race and in Retaliation for his EEO Activity[4]**

Before December 2016, Mr. Perry always received Outstanding performance ratings from both the Department of the Army and the VA.  Plaintiff's Statement of Facts ("Pl. Fact") 6 and 12.  In FY 2016, Mr. Perry had good reason to expect his chain of Outstanding ratings to remain unbroken.  For most of FY 2016, Mr. Perry attended the highly prestigious and competitive Eisenhower School.  Pl. Facts 15 and 16.  His performance there covered the period from October 1, 2015, to June 9, 2016, or eight months of the FY 2016 performance period.  Pl. Fact 16.  As for the remainder of FY 2016, Mr. Perry spent from June 9, 2016, through the July 4 holiday on leave, and the remainder of the performance period on a detail with James Stolarski.  Pl. Facts 25 and 26.  Mr. Perry had not spent a single day of FY 2016 working for Mr. Holland at VALU.  Pl. Facts 29 and 42.  Therefore, his performance appraisal of Outstanding at the Eisenhower School should have been his performance appraisal for FY 2016.  Pl. Facts 20, 21, 42, 52, and 54.

A.  Mr. Perry's Lowered Performance Rating Is an Adverse Action

Although for many employees, being given the second highest available performance rating is not a negative event, it is for employees like Mr. Perry who had earned only the highest ratings available.  The rating he received from Defendant in FY 2016 represented the lowest rating of his career in Federal Service.  As such, it was an adverse action.  *See Steele v. Schafer*, 535 F.3d 689, 696 (D.C. Cir. 2008) (holding as to a retaliation claim that "the issuance of the

---

[4] Mr. Perry is pursuing only race and reprisal as bases for his claim over his FY 16 performance appraisal.  He no longer is pursuing the bases of age, sex or disability.

lowest performance rating of [plaintiff's] career combined with the lowest performance bonus in [plaintiff's] branch" constituted materially adverse action against the plaintiff).

In addition, Mr. Perry suffered financial loss from the lowered rating. The difference in awards in FY 2016 for VALU employees rated Outstanding versus Excellent was $250 in cash and eight hours of time off. Pl. Facts 55 and 56. This Court has found financial loss of approximately this scope to be sufficient to constitute an adverse action. *Warner v. Vance-Cooks*, 956 F. Supp. 2d 129, 140, 163 (D.D.C. 2013) (holding, as to discrimination and retaliation claims, difference in bonus money of, "at most, $217.50" is sufficient to constitute adverse action).

This Circuit has found even small reductions in monetary performance awards sufficient to constitute adverse employment action. *See Russell v. Principi*, 257 F.3d 815, 819 (D.C. Cir. 2001) (in reverse discrimination suit, plaintiff's receipt of bonus of $807 for an "excellent" performance rating, compared to her African-American co-worker's bonus of $1,355 for her "outstanding" rating, represented "the loss of a bonus that is worth hundreds of dollars [and] is not a petty detriment," warranting reversal of summary judgment because plaintiff "presented a prima facie case of reverse discrimination under Title VII based on an adverse employment action."); *Weber v. Battista*, 494 F.3d 179, 185 (D.C. Cir. 2007) (in a retaliation suit, lowered performance evaluation that resulted in the employee not receiving optional cash award, which she had regularly received in each of three years preceding protected activity, could be a materially adverse action). *See also Pollard v. Quest Diagnostics*, 610 F. Supp. 2d 1, 29-30 (D.D.C. 2009) (where plaintiff with a retaliation claim received a one percent decrease in merit pay due to an "Achieves Expectations" rating rather than a higher "Excellent" rating, a decrease deemed "trivial" by defendant, the court nonetheless found a "materially adverse

action").

###### B. Mr. Perry's Lowered Performance Rating was Motivated by Race Discrimination

The evidence raises a question for a jury as to whether the Defendant discriminated against Mr. Perry based on his race (Caucasian) when it lowered his performance rating from Outstanding to Excellent.  First, only three employees in VALU received Outstanding ratings for FY 2016.  All three were African American.  Pl. Fact 51.  Two of the three employees, Jesse Hawkins and Rhonda Carter, together, performed Mr. Perry's position in VALU on a full-time basis while he was at the Eisenhower School.  Yet, they received Outstanding ratings whereas Mr. Perry received a rating of only Excellent. Pl. Fact 50.

In addition, the Defendant's unexplained failure to adhere to its own performance appraisal procedures when it came to Mr. Perry justifies an inference of prohibited motive.  *See Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 495 n.3 (D.C. Cir. 2008) (identifying an "employer's failure to follow established procedures or criteria" as a way a plaintiff can cast doubt on the employer's supposedly legitimate explanation); *Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982) (finding that a failure by employer to follow its own regulations and procedures "is a factor that the trier of fact may deem probative … in determining the true motivation behind" the employment action); *cf. Lathram v. Snow*, 336 F.3d 1085, 1094  (D.C. Cir. 2003)(holding that a jury could draw an inference of discrimination where an agency departed from its normal process without justification).  *See also McIntyre v. Peters*, 460 F. Supp. 2d 125, 138 (D.D.C. 2006) ("[D]efendant's failure to follow its own policy requiring the retention of employment decision documents, when viewed in light of plaintiff's other evidence of pretext, raises a credibility question that is properly left to the jury.") (citations omitted).

Defendant is unable to explain why, on December 9, 2016, Mr. Holland designated himself as Mr. Perry's Rater (first level) for purposes of Mr. Perry's mid-year review yet, only two business days later, on December 13, 2016, redesignated himself as Mr. Perry's Approval Official (second level).  Pl. Fact 43.  Nor can Defendant explain why, for the final performance appraisals, Mr. Holland designated himself as the Rater for other employees for whom he prepared appraisals, but was the Approval Official only for Mr. Perry.  Pl. Fact 45.  Mr. Holland's unexplained switch in roles represented a failure to follow Defendant's established procedures for performance management.  Under Defendant's written procedures, the Rater and Approval Official for a given employee cannot be the same official.  An official cannot review his own performance appraisal of an employee.  As Dr. Tanner admitted during his deposition, Mr. Holland should have signed Mr. Perry's appraisal as the Rater.  Pl. Fact 46.  Also, under Defendant's written procedures, an employee's grievance of his performance appraisal first goes to his Approval Official, who, for Mr. Perry, was Dr. Tanner.  If the employee is not satisfied with his Approval Official's decision, he may then appeal it to the management official at the next higher level in the organization who, in Mr. Perry's case, was PDAS Mitchell.  Dr. Tanner does not, and cannot, deny that what happened with Mr. Perry's FY 2016 appraisal was inconsistent with what should have happened under written VA policy. Pl. Fact 47.   These undisputed facts raise a strong inference that Mr. Holland and Dr. Tanner knew that there was no legitimate non-discriminatory reason supporting their actions and tried to prevent PDAS Mitchell from performing an objective, non-discriminatory review of Mr. Perry's appraisal as Defendant's procedures require.

Mr. Holland's silence on these irregularities is telling.  Attached to Defendant's Motion (as DEX 5) is a declaration from Mr. Holland dated March 19, 2019, more than two years after

Mr. Perry received his FY 2016 rating.  Although much of Mr. Holland's declaration addresses Mr. Perry's FY 2016 appraisal (paragraphs 11-19), and goes into a fair amount of detail on some matters (much of which Mr. Perry believes to be inaccurate), it says nothing at all about why Mr. Holland strayed from Agency procedures when it came to Mr. Perry's appraisal, and only Mr. Perry's appraisal.

   C.   Mr. Perry's Lowered Performance Rating was Retaliatory

The evidence raises a question for a jury as to whether Mr. Perry's lowered performance rating was motivated by retaliation for his EEO complaint. The timeline of relevant events that are close in time to one another raises an unassailable inference that Mr. Perry was retaliated against for exercising his EEO rights.

October 19, 2016 – Mr. Perry initiated contact with an EEO Counselor.  Pl. Fact 34.

November 1, 2016 – Dr. Tanner sent an email to Mr. Perry, on which he copied PDAS Mitchell, which both acknowledges that he knows about Mr. Perry's EEO complaint and falsely accuses Mr. Perry of creating a "perception of impropriety" and evading the accepted procedure for requesting leave. At his deposition, Dr. Tanner admitted that he does not recall ever having sent PDAS Mitchell an email about any other employee purportedly not following leave procedures. Pl. Fact 35 and 36.

November 9, 2016 – Dr. Tanner excluded PDAS Mitchell from his email to Mr. Perry in which he admitted that he had wrongfully accused Mr. Perry on November 1.  Pl. Fact 36.

November 10, 2016 – At 3:56 p.m. Dr. Tanner wrote Mr. Perry an email acknowledging that Mr. Perry initiated the EEO process. Pl. Fact 27.

November 10, 2016 – Only *12 minutes later*, at 4:08 p.m. after Dr. Tanner wrote Mr. Perry an email acknowledging his EEO complaint, Dr. Tanner tried, once more, to damage Mr.

Perry's reputation in the eyes of PDAS Mitchell by sending her another email.  In that email, Dr. Tanner falsely accused Mr. Perry of acting erratically upon his return to VALU and claimed that he learned of this from conversations with others.  But, at his deposition, Dr. Tanner could not recall a single such conversation.  Moreover, Mr. Hawkins, who worked side-by-side every day with Mr. Perry after he returned to VALU, denied that Dr. Tanner's description of Mr. Perry's conduct was at all accurate.  Instead, Mr. Hawkins testified that Mr. Perry was fully engaged and performing his job.  Pl. Facts 37 and 38.

November 21, 2016 – Mr. Perry filed his formal discrimination complaint.  Pl. Fact 39.

December 13, 2016 – Mr. Perry received his lowered performance rating.  Pl. Fact 41.

December 21, 2016 – Mr. Holland denied Mr. Perry's informal grievance of his appraisal without acknowledging a single one of Mr. Perry's objections. Pl. Fact 49.

December 23, 2016 – Dr. Tanner denied Mr. Perry's formal grievance of his appraisal by falsely alleging that Mr. Perry's informal grievance "contained mostly personal statements attacking the character and professional competency" of Mr. Holland and Mr. Stolarski.  *Id.*

It is well settled that temporal proximity between protected activity and an adverse action raises an inference of retaliatory motive. *See Gleklen v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1368 (D.C. Cir. 2000) (temporal proximity between protected activity and a subsequent adverse personnel action is sufficient to raise an inference of retaliatory motive); *Singletary v. District of Columbia*, 351 F.3d 519, 524-25 (D.C. Cir. 2003) (courts must consider a plaintiff's "ongoing pursuit of protected activity" in determining whether temporal proximity exists). Even where the adverse activity is merely the beginning of a course of retaliatory conduct or the first step toward actionable retaliation, it may suffice to show the motive necessary for the claim. *See Hamilton v. Geithner*, 666 F.3d at 1358 (measuring temporal

proximity between protected activity and manager's first step toward the adverse action –
ignoring plaintiff's request for information about a detail – and concluding that the two month
period was short enough to raise an inference of retaliation). *See also Nat'l R.R. Passenger
Corp. v. Morgan* , 536 U.S. 101, 113 (2002) (that an alleged act of discrimination is not
actionable does not "bar an employee from using prior acts as background evidence in support of
a timely claim.").

Mr. Perry's initiation of the EEO process was immediately followed by a series of hostile
actions by Dr. Tanner culminating in Mr. Perry's unjustly lowered performance rating. These
circumstances raise an inference of retaliation.  On summary judgment, all reasonable inferences
must be drawn in Mr. Perry's favor. *See Reeves*, 530 U.S. at 150.

In addition, it is relevant that Mr. Hawkins and Ms. Carter, who worked together to
perform a job that Mr. Perry had performed alone, and yet received higher ratings than Mr.
Perry, had not engaged in any EEO activity by the time they received their ratings.  Pl. Fact 50.

## V.     Summary Judgment is not Appropriate on Plaintiff's Non-Selection Claim Because a Reasonable Jury Could Find that his Non-Selection was Based on his Race[5]

Mr. Perry applied for the position of Management Services Officer, GS-15.  The specific
responsibilities of the position involve "Providing efficient, timely, and cost effective support
services to all VA Central Office (VACO) to include the Office of the Secretary, Departments,
and Staff Offices located in VACO and the outlying campus buildings in the Washington DC
metropolitan area."  Pl. Fact 58.  According to Harry Wilkes, who, at the time, was Deputy

---

[5] Mr. Perry is pursuing only race as the basis for his claim of non-selection. He no longer is pursuing the bases of
age, sex, disability, or reprisal.

Director for Defendant's SMG, the Management Services Officer position "was basic logistics, it was Randy." Pl. Fact 66.

   A.   Mr. Perry's Non-Selection for Management Services Officer was Discriminatory

   "If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job ... the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate--something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." *Aka v. Wash. Hosp. Ctr.,* 156 F.3d 1284, 1294 (D.C. Cir. 1998). The Supreme Court later clarified that the qualification disparity need not be so great as to "jump off the page." *Ash v. Tyson Foods, Inc.,* 546 U.S. 454, 455 (2006). Such a high standard would mean that "no job discrimination case could ever go to trial." *Aka*, 156 F.3d at 1294. Instead, this Circuit requires the qualification to be more than a "close case." *Id.*

   A reasonable jury could find that Mr. Perry not only was qualified to be the Management Services Officer but was substantially more qualified than the selectee, Eric Whitehurst. This was far from a close case.

   Mr. Perry's experience with logistics goes back to 1997 when he entered the U.S. Army as an enlisted Logistics Soldier. He graduated from U.S. Army Candidate School in 2000 as an Honor Graduate in logistics. He then served another seven years as an Army Logistics Officer. Pl. Fact 2. Mr. Perry continued his successful logistics career as a Senior Logistics Management Specialist at Raytheon International where he served as the primary logistics program planner, action officer, and operations management coordinator. Pl. Fact 3. Then, Mr. Perry's logistics career continued in management positions as Government contractor at the Pentagon and then as a federal employee. Pl. Facts 4 and 5. At the Eisenhower School, Mr. Perry graduated in the top

25% of his class and excelled in logistics.  Pl. Fact 21. In addition, Mr. Perry was the lead

program manager at VALU, which had the largest and most complex portfolio within the SMG,

with 29 projects worth approximately $80 million annually. Pl. Fact 64.

Mr. Whitehurst was not selected for the Eisenhower School or any other NDU school.

Nor would Mr. Whitehurst have been qualified to attend the schools because of his lack of

civilian management experience in the Federal Government. Pl. Fact 63.  At the time Mr.

Whitehurst was selected for Management Services Officer, he was responsible for one of the

smallest portfolios in SMG. Pl. Fact 64.  Mr. Hurndon's familiarity with Mr. Whitehurst, based

on the latter's work as a portfolio manager, did not qualify Mr. Whitehurst for Management

Services Officer, which is not a portfolio management position but, instead, a management

services position.  The Management Services Officer position is a facility logistics job, and

facilities logistics and portfolio management are two different jobs.  Unlike Mr. Whitehurst, Mr.

Perry had all of the logistical skill sets to fit the billet. Pl. Fact 67.

Joseph Viani, former SES Director of SMG, supervised both Mr. Perry and Mr.

Whitehurst and gave his "highest unconditional recommendation" to Mr. Hurndon that he select

Mr. Perry. Mr. Viani found it "odd" that Mr. Whitehurst was selected over Mr. Perry for

Management Services Officer. Pl. Fact 65.

Apart from their statements that Mr. Whitehurst received the highest cumulative score

from the Best Qualified and interview process, neither Ms. Akinselure not Mr, Hurndon offered

any explanation whatsoever as to why they selected Mr. Whitehurst despite the clear superiority

of Mr. Perry's credentials for the Management Services Officer position.  Pl. Fact 69.

Defendant offers no explanation whatsoever as to the experiences, skills or education on which

the decision was made that Mr. Whitehurst was a superior candidate to Mr. Perry.

Like the agency's explanation for its non-selection in *Figueroa v. Pompeo*, 2019 U.S.

App. LEXIS 14010, __ F.3d __, 2019 WL 2063562 (May 10, 2019), Defendant's explanation for

its selection of Mr. Whitehurst over Mr. Perry does not satisfy the second prong of *McDonnell*

*Douglas*.  Reversing the district court's acceptance of an agency's reason for not selecting

plaintiff for a promotion – that the selected candidates were better qualified – the D.C. Circuit

explained that:

> A central purpose of the second prong is to "focus the issues" and provide the worker
> "with 'a full and fair opportunity' to attack the" explanation as pretextual. . . . the
> evidence must present a "clear and reasonably specific explanation."  A "plaintiff cannot
> be expected to disprove a defendant's reasons unless they have been articulated with
> some specificity." (citations omitted).

*Id*. at **15-16.  In *Figueroa*, the D.C. Circuit found that the agency's explanation, with nothing

more, that it selected the best qualified applicants, was not sufficient to carry its burden of

providing a legitimate, nondiscriminatory reason because it "conceal[s] the target" at which the

non-selected employee must aim pretext arguments.  *Id*. at 16, 18.[6]  Defendant's explanation for

its selection of Mr. Whitehurst, like that in *Figueroa*, conceals the target at which Mr. Perry must

aim pretext arguments.

Other facts, or disputed facts, supporting a finding of pretext are Ms. Akinselure's and

Mr. Hurndon's partiality to other African Americans in their selections for GS-15 and SES

positions (Pl. Fact 68), and that Mr. Hurndon introduced Mr. Whitehurst as the new Management

Services Officer before the second-round interviews of Mr. Perry and Mr. Whitehurst took place.

Pl. Fact 61. Also, had combined Best Qualified and interview scores been the actual reason for

---

[6] *Figueroa* appears to rely upon an Eighth Circuit case, *Nelson v. USAble Mutual Insurance Co*., 918 F.3d 990 (8th
Cir. 2019), for the proposition that a lower interview score is a legitimate nondiscriminatory reason for a non-
selection.  However, in that case, unlike here, there was an additional explanation for the non-selection – that the
selectee's retail experience was more directly relevant to the position and her current duties were extremely similar
to those of the position.  Defendant provided no such explanation for its selection of Mr. Whitehurst.

the Defendant's decision, then it would have offered a second interview to applicant Martha

Ramirez, who received the second highest combined score of 44/312 compared with Mr. Perry's

combined score of 47/302, the third highest combined score.  Instead, Defendant's rationale for

the selection is pure pretext.

**VI.      Summary Judgment is not Appropriate on Plaintiff's Loss of Supervisory Function Because a Reasonable Jury Could Find that it was in Retaliation for his EEO Activity[7]**

At VALU, Mr. Perry was the Supervisory Deputy Director, LDD.  Pl. Facts 9 and 11.

Mr. Perry held a supervisory function throughout his tenure at VALU, even serving as the Acting

Director in addition to his assigned Deputy duties from November 2014 to April 2015.  Pl. Fact

11.  After Mr. Perry returned to VALU from the Eisenhower School and his detail with Mr.

Stolarski, he learned on November 9, 2016, that through a VA reorganization, VALU would no

longer exist as of January 9, 2017.  Pl. Fact 71.  On November 9, Mr. Perry received a Transfer

of Function Notification pursuant to which his position was to transfer to VHA/HLTI, and he

would be reporting to Mr. Pellum. Pl. Fact 72.  The Notification stated that Mr. Perry's

supervisory position in VALU would "continue in identical form" in the new office, VHA/HLTI.

Pl. Fact 77.  Mr. Pellum knew that Mr. Perry was supposed to retain his supervisory function and

led him to believe that he would.  Pl. Facts 73 and 82.  However, on January 31, 2017, at a public

forum, Mr. Perry learned for the first time from Mr. Pellum that his supervisory authority would

be taken away and he would remain a supervisor in name only.  Pl. Fact 83.  While this

happened, Mr. Perry was continuing to pursue his EEO complaint.  Pl. Facts 34 and 39.

---

[7] Mr. Perry is pursuing only reprisal as the basis for his claim of lost supervisory function. He no longer is pursuing the bases of age, sex, disability, or race.

A.  Mr. Perry's Loss of his Supervisory Function is an Adverse Action

A reduction in duties is an adverse action even without loss of pay or grade. *Holcomb v. Powell*, 433 F.3d 889, 902-03 (D.C. Cir. 2015).  That includes a withdrawal of an employee's supervisory duties. *Geleta v. Gray*, 645 F.3d 408, 411 (D.C. Cir. 2011); *Stewart v. Ashcroft*, 352 F.3d 422, 427 (D.C. Cir. 2003).

B.  Mr. Perry's Loss of his Supervisory Function was Retaliatory

There was a causal link between Mr. Perry's protected activity and the adverse action he suffered.  To survive summary judgment, Mr. Perry "needn't provide direct evidence that his supervisors knew of his protected activity; he need only offer circumstantial evidence that could reasonably support an inference that they did." *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009). Here, circumstantial evidence exists that Mr. Pellum knew that Mr. Perry initiated the EEO process.  Further, there is evidence that as soon as Mr. Perry amended his EEO complaint to cover the withdrawal of his supervisory authority, Mr. Pellum consulted with Human Resources about demoting Mr. Perry from GS-14.

On October 21, 2016, only two days after Mr. Perry initiated his EEO complaint against Mr. Holland and Dr. Tanner, Mr. Pellum wrote in an email that "The informal communication chain with VALU is that he [Mr. Perry] was not highly thought of there."  At his deposition, Mr. Pellum admitted that he had discussions with Dr. Tanner about the transfers of certain VALU employees to HLTI and that he could not recall a single individual other than Dr. Tanner or Mr. Pellum from whom he obtained the information on which he based his disparaging email about Mr. Perry.  Pl. Facts 75 and 76. This is strong evidence that Dr. Tanner disclosed Mr. Perry's EEO activity to Mr. Pellum.  And, this would not have been the first time that Dr. Tanner discussed Mr. Perry's EEO activities with others while also spreading derogatory and false

information about him. (*See, e.g.*, Pl. Facts 35-38).  On January 31, 2017, two months after Mr. Perry's formal EEO complaint of November 21, 2016, Mr. Perry learned of Mr. Pellum's decision (presumably made before that day) to withdraw the supervisory authority that was supposed to transfer with Mr. Perry. Pl. Facts 77, 79, and 82.

Defendant, nonetheless, argues that it had a legitimate reason for its action – it had decided that the reduction of Mr. Pellum's office from nine to six employees took away the need to have Mr. Perry supervise anyone.  Motion at 8.  But, that was not Defendant's decision to make.  Mr. Pellum and Ms. Deitzen were on plain notice that under the reorganization, it was required that Mr. Perry's supervisory function transfer to whatever new position he would assume at HLTI.  Pl. Facts 73 and 74.  The Transfer of Function Notification was certainly not a notification of demotion, and managers cannot demote employees who don't have performance or conduct problems whenever it suits them.

The retaliation against Mr. Perry did not end on January 31, 2017.  On Thursday, February 23, 2017, Mr. Perry put Mr. Pellum on notice that he was amending his EEO complaint to include the removal of his supervisory authority. Pl. Fact 85.  On Tuesday, February 28, only three work days later, Mr. Pellum  wrote to Human Resources that "[i]f [Mr. Perry] is not a supervisor, I do not think he will stay as a 14."  In the same email, in addition to revealing a retaliatory plan to demote Mr. Perry, Mr. Pellum went on to unjustly accuse Mr. Perry of not making any significant accomplishments and "that does not seem to even phase [Mr. Perry] one bit."  Pl. Fact 87.  Afterwards, Mr. Pellum rejected Mr. Perry's proposal to mediate a resolution. Neither he nor Ms. Deitzen did anything to restore Mr. Perry's supervisory authority.  Pl. Fact 88.  Thus, Mr. Perry had no choice but to transfer out of HLTI if he had any hope of retaining his supervisory authority and moving forward with his career.

By December 2017, after serving in several details, Mr. Perry was still not assigned to any permanent position.  Pl. Facts 89-92.  Jessica Bonjorni, who was charged with placing Mr. Perry in an appropriate permanent position, took no action and refused to speak with him. Instead, from then until Mr. Perry left the VA on September 4, 2018, Ms. Bonjorni kept him in career purgatory, forcing him to sit in an intern's cubicle even though office space was available, and denying him performance standards for FY 17 and FY 18 as well as a performance appraisal or award for FY 17.  Pl. Facts 92, 94, and 95.

**VII.    Defendant Subjected Mr. Perry to a Hostile Work Environment**

As individual actions, the lowered performance rating, non-selection, and withdrawal of supervisory authority were acts of hostility that damaged Mr. Perry professionally, financially, and emotionally.  Taken together, along with the other agency actions leading to and following from these three events, they placed Mr. Perry, a consistently outstanding performer with stellar career and academic credentials, into an undeserved career purgatory.  The only available means of escape from the purgatory was a position Mr. Perry obtained at a different federal agency on September 4, 2018.  What Defendant did interfered with Mr. Perry's work by blocking him from using the skills and training he acquired at the Eisenhower School and, towards the end of his VA career, leaving him with no work at all.

The Supreme Court has held that for a hostile work environment to exist, the alleged harassment must be so "severe or pervasive" as to "alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (internal quotation omitted). "In order to be actionable under [Title VII], a[n] . . . objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did

perceive to be so." *Id*. at 787 (citing *Harris v. Forklift Sys.* 510 U.S. 17, 21-22 (1993)). To determine whether an environment is objectively abusive, courts consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Defendant subjected Mr. Perry to a series of discriminatory, retaliatory and hostile actions culminating in a seriously damaged career and professional reputation that Defendant was never going allow Mr. Perry to rehabilitate.  Defendant's actions, designed to humiliate Mr. Perry and prevent him from advancing from, or even maintaining, his status as a supervisory GS-14 employee, would have driven away any other employee who did not want his career to suffer from irreparable damage.  As such, Mr. Perry's work environment was objectively abusive.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully request that the Court deny defendant's motion for summary judgment and allow this case to proceed in a trial on the merits.

Respectfully submitted,


Rosa M. Koppel (DC Bar No. 405779)
Law Offices of Larry J. Stein, LLC
4023 Chain Bridge Road, Suite 10
Fairfax, Virginia  22030
Telephone:  (703) 383-0300
Facsimile:  (703) 736-3115
rosakoppel@ljslaw.net

Counsel for Plaintiff Randy L. Perry