UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RANDY L. PERRY, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 17-cv-2021 (TSC) |
| ROBERT WILKIE, SECRETARY, DEPARTMENT OF VETERANS AFFAIRS | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff Randy Perry brings four claims against the Department of Veterans Affairs ("VA") for: (i) creation of a hostile environment based on discrimination of protected status, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-16 ("Title VII"), and the Rehabilitation Act of 1973, 29 U.S.C. § 794(a); (ii) creation of a hostile work environment based on retaliation against protected activities, in violation of Title VII, (iii) failure to promote based on discrimination against race, in violation of Title VII, and (iv) removal of supervisory authority based on retaliation against protected activities, in violation of Title VII. (ECF No. 1 ("Compl.") ¶¶ 12–16.)

Title VII provides that federal employees shall be "made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). The Rehabilitation Act provides that qualified federal employees with a disability shall not be "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . ." 29 U.S.C. § 794(a). Title VII and the

1

Rehabilitation Act are applicable to Defendant VA. *See* 29 U.S.C. § 794(a); 42 U.S.C. § 2000e-16(a) (citing 5 U.S.C. § 105).

Defendant moves for summary judgment on all four claims. For the reasons set forth below, Defendant's motion will be GRANTED with respect to all claims.

## I. FACTUAL BACKGROUND

Except where indicated, the following facts are undisputed. Plaintiff began work for Defendant on March 11, 2013. (Compl. ¶ 2.) Between then and June 2, 2014, he worked as a GS-14 Program Analyst in the Strategic Management Group ("SMG") of the Office of Human Resources & Administration. (*Id.* ¶¶ 19–20.) On June 2, 2014, he became Deputy Director of Leadership Development Directorate ("LDD") at the VA Learning University ("VALU"). (*Id.* ¶ 20.)

Between August 3, 2015 and June 9, 2016 Plaintiff attended the Dwight D. Eisenhower School for National Security and Resource Strategy ("Eisenhower School") at the National Defense University. (*Id.* ¶¶ 24, 28.) During that time, Dr. George Tanner, the Dean of VALU, appointed two employees to act in Plaintiff's stead as co-Deputy Directors of LDD. (*Id.* ¶ 33.) Plaintiff alleges, and Defendant disputes, that Tanner offered one of the employees, Rhonda Carter, the position of LDD Director. (*Id.* ¶ 34; ECF No. 8 ("Answer") ¶ 34.)

### A. Performance Evaluation

On June 24, 2016, while Plaintiff was on annual leave shortly after graduating from the Eisenhower School, VALU Deputy Dean Marty Holland emailed Plaintiff to ask for a signed copy of Plaintiff's annual performance standards and summary rating. (Compl. ¶¶ 35–37;

Answer ¶ 37.) Plaintiff claims, and Defendant disputes, that Holland pressured, harassed and bullied him to sign retroactive performance standards, which "had nothing to do with any of the work [Plaintiff] performed during the rating period." (Compl. ¶ 35; Answer ¶ 35.) Plaintiff also alleges, and Defendant also disputes, that he did not report to Holland during the performance appraisal period. (Compl. ¶ 36; Answer. ¶ 36.) After receiving the requests from Holland, Plaintiff informed Tanner, who, according to Plaintiff, did nothing to resolve his concerns. (Answer ¶ 38; Compl. ¶ 38.)

Plaintiff returned from leave on July 5, 2016 and was assigned to a detail with Jim Stolarski, Senior Advisor to the Under Secretary for Health, to work on a Critical Staffing Initiative. (*See* Compl. ¶ 43.) On July 28, 2016, during a meeting with Holland, Plaintiff refused to sign Holland's proposed performance standards. (*See* ECF No. 24-1 ("Pl. SOF") ¶ 23.) Plaintiff proposed to use his 2015 performance standards as a compromise. (*Id*.) Holland "allegedly marginalized" Plaintiff's performance at the Eisenhower School, where his academic report referred to him as an "outstanding" student. (*Id*. ¶ 24.)

Plaintiff, concerned with Holland's review and Tanner's inaction, on August 2, 2016, sent a memorandum expressing his concern that "personalities have now become involved in the workplace" to Pamela Mitchell, Principal Deputy Assistant Secretary for Human Resources. (*Id*. ¶ 29.) Plaintiff described Holland as "condescending and attitudinal." (*Id*. ¶ 27.)

On the same day, Mitchell met with Plaintiff and assigned Terry Mintz, Director of Administrative Operations, to rate his performance. (*Id*. ¶ 30.) Mintz was allegedly selected because Plaintiff's then-supervisor, Stolarski, could not provide a rating for Plaintiff. (*Id*.) On September 9, 2016, Holland emailed Plaintiff to schedule Plaintiff's mid-year progress review.

3

(*Id.* ¶ 32.) Plaintiff responded that he was on detail and that Holland should refrain from contacting him any more regarding his FY16 Performance Review. (*Id.*)

On October 13, 2016, Mitchell notified Plaintiff that his detail was over and that he would have to return to VALU. (*Id.* ¶ 33.) She further advised Plaintiff that Holland would sign his appraisal as the supervisor of record. (*Id.*) Plaintiff expressed reservations about his return to VALU but returned as the Deputy Director a month later. (*Id.* ¶ 35.)

On November 1, 2016, in an email to Plaintiff and Mitchell, Tanner wrote that Plaintiff had failed to submit his leave requests through his supervisory chain and suggested that Plaintiff follow protocols to avoid a "perception of impropriety." (*Id.* ¶ 37–39.) In a reply to all, Plaintiff responded that because he was initially at the Eisenhower School and later on temporary detail, he had submitted his leave through LDD. (*Id.* ¶ 38.) He also denied that Holland was ever his supervisor. (*Id.*) On November 9, in an email to Plaintiff (with Mitchell not copied), Tanner acknowledged that his original email instruction regarding leave policy was incorrect, but reiterated that Holland was Plaintiff's supervisor for performance evaluation. (*Id.* ¶ 38; ECF No. 23-12 at 2–3.)

On December 9, 2016, Holland gave Plaintiff a "fully successful or better" rating for his mid-year review. (Pl. SOF ¶ 40.) Four days later, he gave Plaintiff an "Excellent" performance evaluation. (*Id.* ¶ 41.) Both ratings were out of cycle, because Holland and Plaintiff did not agree to the performance standards until July 28, 2016. (*Id.*)

### B. Application of Management Service Officer Position

On October 28, 2016, Plaintiff applied for a Management Service officer ("MSO") position at the VA. (*Id.* ¶ 43.) Laura Akinselure, an Associate Deputy Assistant Secretary and

4

the selection official, received a list of five candidates eligible for the position, including Plaintiff. (Pl. SOF ¶ 45; ECF No. 23-9 ("Def. Ex. 6") at 43–46.) The candidates were chosen based on the Best Qualified process, composed of a written application and an interview process. (Def. Ex. 6 at 43–46.) Both Plaintiff and another candidate, Eric Whitehurst, a black man, received a score of 47 for their written applications, the highest among all the candidates. (Pl. SOF ¶ 45.)

The candidates were then interviewed by a three-person panel, composed of Akinselure, a black woman; Jeff Farrand, a white man; and Barry Brinker, also a white man. (*Id.* ¶ 46.) Akinselure interviewed Plaintiff in person, while the other panelists participated by phone. (*Id.*) The same questions were asked of each candidate during the first-round interview. (*Id.* ¶ 50.) Whitehurst received the highest score of 350; another candidate, Martha Ramirez, received the second highest score of 312; and Plaintiff received the third highest score of 302. (*Id.* ¶ 51.) Each of the three panelists gave higher scores to Whitehurst than to Plaintiff. (*Id.* ¶ 52.) Whitehurst received higher scores than Plaintiff for 12 of the 13 questions, and the same scores for the one remaining question. (*See* ECF No. 23-10 at 69.)

On December 6, 2016, Plaintiff and Whitehurst were selected for a "meet-and-greet" with Akinselure and her supervisor, Roy Hurndon, a black man. (*See* Pl. SOF ¶ 53.) Plaintiff understood the 30-minute meet-and-greet to be a second-round interview, and claims that while at the meet-and-greet, Hurndon introduced Whitehurst to the office as the new MSO. (*Id.* ¶¶ 60–61.) On December 15, Plaintiff learned that Whitehurst was selected for the position. (*Id.* ¶ 62.)

Plaintiff claims that he was far more qualified for the MSO position than Whitehurst. (*See, e.g.*, ECF No. 24 ("Pl. Opp.") at 32.) He points out that he was chosen to attend the Eisenhower School, while Whitehurst was not, and alleges that at the time of the selection, he

5

was running the largest and most complex portfolio within SMG, while Whitehurst was running the smallest. (Pl. Opp. at 16, 33.) Plaintiff also claims that two high-ranking officials at SMG, who had supervised both candidates, found Plaintiff more qualified than Whitehurst, and that Whitehurst's expertise in portfolio management does not align with the facility logistics expertise required for the MSO position. (*Id.* at 16.) Plaintiff further claims that of the four positions for which Akinselure did the recruiting between 2014 and 2018, three of the selectees were black. (*Id.* at 17.)

### C. Reorganization of VALU and Removal of Authority

In early fall 2016, Plaintiff learned that VALU would be disbanded in January 2017, and Plaintiff's unit, LDD, would be absorbed into the Health Leadership Talent Institute ("HLTI"). (Pl. SOF ¶¶ 63–64.) During a meeting with Marty Pellum, who was slated to become Plaintiff's direct supervisor at HLTI, Plaintiff learned that he would become Associate Director for Talent Assessment and supervise two employees. (*Id.* ¶ 64.) Plaintiff and an Associate Director for Workforce Planning, who would lead five employees, would directly report to Pellum, who would supervise the nine employees. (*Id.* ¶ 65.)

Plaintiff received an official notice on November 9, 2016 that his role would be moved to HLTI effective January 8, 2017. (*Id.* ¶ 66.) On December 21, however, Defendant approved a plan to transfer three workforce planning positions, including Plaintiff's previously assigned supervisory position, from HLTI to Human Capital System and Services. (*Id.* ¶ 67.)

During a meeting with Pellum and HLTI director Denise Deitzen at a workshop in late January, Plaintiff was informed that Pellum's division would no longer have two Associate Directors because of a reduction in staff. (*See* Pl. SOF ¶ 70.) However, during lunch with

6

Pellum on January 31, Plaintiff claims he was not told about the fate of his position and did not learn until a meeting after lunch that he would not become a supervisor. (*Id.*) Plaintiff claims that the public announcement at lunch made him feel humiliated. (*See* Compl. ¶ 71.)

Plaintiff claims that before the announcement on January 31, Pellum repeatedly assured him that he would retain his supervisory authority. (Pl. SOF ¶ 82.) Plaintiff was further reassured by an SF-50 form issued on January 8, 2017, indicating that he would retain his function as a Supervisory Program Analyst. (*Id.* ¶ 79.) An updated organizational chart showed that he would supervise five program specialists. (*Id.* ¶ 64.)

### D. EEO Activities

On October 19, 2016, Plaintiff contacted a counselor at VA's Office of Resolution Management ("ORM") and met with the counselor the next day. (*Id.* ¶ 34.) On November 1, in the email in which Tanner allegedly accused Plaintiff of failing to follow leave policy, Tanner acknowledged Plaintiff's EEO activities and told him that he had discussed Plaintiff's ORM case with an EEO official. (*Id.* ¶ 35.)

On November 10, 2016, Tanner acknowledged by email that Plaintiff had filed a grievance with ORM and obtained legal counsel. (*Id.* ¶ 37.) Plaintiff claims that twelve minutes later, Tanner emailed Mitchell, trying to impugn Plaintiff's reputation by suggesting that he was not working and was "erratic, unfocused, and surly." (*Id.*)

Plaintiff felt that his informal complaint was unresolved, and filed a formal complaint on November 21, 2016, alleging multiple instances of employment discrimination on the basis of age, disability, and reprisal. (*Id.* ¶ 39.)

On February 9, 2017, Plaintiff amended his complaint, adding events associated with his removal from supervisory authority at HLTI. (Pl. SOF ¶ 85.) Plaintiff claimed that after

learning about his EEO complaint for removal of supervisory authority, his supervisors refused to correct the situation. (*Id.* ¶ 88.) He also claims that from February 2017 to September 2018, before he left for a position at the Transportation Security Agency, Defendant placed him on multiple details, refused to give him a supervisory position, and neglected to place him under performance standards or provide appraisals in 2017 and 2018. (*Id.* ¶ 93.)

On September 18, 2017, Plaintiff received a Report of Investigation from the VA. (Compl. ¶ 51). On October 2, 2017, he filed this lawsuit. (Pl. SOF ¶ 71.)

## II.  LEGAL STANDARD

Summary judgment is appropriate when there is no disputed genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A dispute of fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A dispute is "material" only when it involves facts "that might affect the outcome of the suit under the governing law." *Id.* In determining whether a genuine issue of material fact exists, the court must view the facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (internal quotations omitted). In response, the nonmoving party must "go beyond the pleadings" and identify specific facts which show there is a genuine issue for trial. *Id.* at 324. To defeat summary judgment, the nonmovant must "provide evidence that would

permit a reasonable jury to find [in his favor]." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (citations omitted).

In evaluating a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The court must "eschew making credibility determinations" at the summary judgment stage. *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2017). However, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted). "[C]onclusory assertions offered without any evidentiary support do not establish a genuine issue for trial." *Wang v. Wash. Metro. Area Transit Auth.*, 206 F. Supp. 3d 46, 63 (D.D.C. 2016) (citing *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999)).

## III.  ANALYSIS

### A.  Hostile Environment Based on Discrimination

To prevail on a discriminatory hostile environment claim, Plaintiff must show that Defendant subjected him to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment" because of his race, gender, religion, or national origin. *Harris v. Forklift*, 510 U.S. 17, 21–22 (1993); *see also Park v. Howard Univ.*, 271 F.3d 904, 906 (D.C. Cir. 1995). Plaintiff must show that the acts, in combination, were sufficiently severe or pervasive, and were part of the same actionable hostile work environment practice. *See Singletary v. District of Columbia*, 351 F.3d 519, 527 (D.C. Cir. 2003) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115, 120 (2002)).

Plaintiff proffers several incidents in support of his claim:

9

> "(i) offering Ms. Carter the LDD Director GS-15 position at VALU; (ii) planning to give his billet to a black, female and non-disabled employee in order to make him vulnerable to a reduction in force ('RIF'); (iii) pressuring Plaintiff to sign retroactive performance standards; (iv) having Holland contact him about performance standards after Ms. Mitchell instructed Holland not to do so; (v) marginalizing his 'outstanding' performance at the Eisenhower School; (vi) failing to place him in a senior leadership position upon his graduation from the Eisenhower School; and (vii) placing him in a detail in which the work was not meaningful and the supervisor was without authority to supervise or rate employees."

(Def. MSJ at 27; *see also* Compl. ¶¶ 77–80.)

Plaintiff's claim is insufficient for several reasons. First, he has failed to provide evidentiary support for some of the incidents that form the basis of his claim. *See Celotex Corp.*, 477 U.S. at 324 (holding that the mere pleadings themselves are insufficient to oppose a summary judgment motion). For example, Plaintiff did not proffer any fact in support of his claim that Defendant planned to give his "billet"[1] to another employee to make Plaintiff vulnerable for the RIF. Nor did Plaintiff provide any evidentiary support for his claim that Mitchell instructed Holland not to contact Plaintiff about signing the retroactive performance evaluation. While it is possible that Mitchell might have instructed Holland not to pressure Plaintiff to sign retroactive evaluation, the email correspondence provided by Plaintiff does not support such an inference. It shows only that Mitchell asked Terry Mintz to step in to do Plaintiff's performance evaluation during his detail with Stolarski. (*See, e.g.*, Def. MSJ at 5; Pl. Opp. at 7.) Plaintiff has not adduced any evidence suggesting that Mitchell specifically instructed Holland not to contact Plaintiff.

Second, Plaintiff fails to articulate a nexus between any discriminatory animus and the seven alleged incidents described above. Title VII does not prohibit all forms of workplace

---
[1] The court interprets this to refer to his job.

10

harassment, only those related to discrimination on the basis of protected status. *See Stewart v. Ashcroft*, 352 F.3d 422, 428 (D.C. Cir. 2003). A reviewing court will exclude an incident if it "had no relation to the other acts . . . or for some other reason . . . was no longer part of the same hostile environment claim." *See Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011) (quoting *Morgan*, 536 U.S. at 118). Here, Plaintiff provides no evidence that Carter was offered the LDD Director position because of her race.[2] Similarly, assuming that Holland pressured Plaintiff to sign retroactive performance standards, Plaintiff offers no facts suggesting that the action was motivated by discriminatory intent rather than a personality conflict. (*See, e.g.*, ECF No. 23-4 at 33–34.) Likewise, even if Holland sought to marginalize Plaintiff's performance at the Eisenhower School, Plaintiff does not point to any evidence that Holland's action was motivated by discriminatory animus. In addition, while it might be reasonable for Plaintiff to expect promotion or advancement after graduating from the Eisenhower School, he does not articulate any connection between his non-promotion and any unlawful discrimination.[3] Finally, Plaintiff proffers no evidence to support his claim that he lost his supervisory authority because of Defendant's unlawful discrimination against him. (Compl. ¶ 96.)

Because Plaintiff's hostile work environment claim lacks evidentiary support or any nexus with discrimination against a protected status, Defendant's motion for summary judgment with respect to this claim will be GRANTED.

---

[2] Moreover, "[c]omments made outside of the employee's presence are generally not actionable as the basis for a hostile work environment claim." *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 91 (D.D.C. 2013).

[3] To the extent that another candidate was chosen over him for the MSO position, Plaintiff does not rely on this incident to support his hostile work environment claim, and the court will reject his failure-to-promote claim. (*See* Part C, *infra*.)

11

### B. Hostile Environment Based on Retaliation

To prevail on a retaliatory hostile environment claim, Plaintiff must satisfy the same severe-or-pervasive standard under a discriminatory hostile environment claim. *See Hussain v. Nicholson*, 435 F.3d 359, 367 (D.C. Cir. 2006) (citing *Harris*, 510 U.S. at 21–22). The actions giving rise to the claim must collectively establish a hostile environment that is sufficiently severe or pervasive, and must be sufficiently connected to each other to be part of the same unlawful employment practice. *See Baird*, 662 F.3d at 1253 (citing *Harris*, 510 U.S. at 21; *Morgan*, 536 U.S. at 115). In reviewing the claim, the court focuses on such factors as "frequency of the discriminatory conduct; its severity; whether it was threatening and humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's work performance." *Byrd v. Vilsack*, 931 F. Supp. 2d 27, 46 (D.D.C. 2013) (quoting *Harris*, 510 U.S. at 23).

Plaintiff alleges two instances of retaliatory action. First, that Tanner tried to damage his reputation for integrity by emailing Mitchell accusing Plaintiff of disregarding the proper procedure for requesting leave. (Compl. ¶ 85.) Second, Plaintiff alleges that Holland lowered his performance rating to "Excellent" despite his receiving an "Outstanding" rating at the Eisenhower School. (*Id.*)

To prevail on a hostile work environment claim, a plaintiff cannot rely on "an array of unrelated discriminatory or retaliatory acts." *Ware v. Hyatt Corp.*, 80 F. Supp. 3d 218, 231 (D.D.C. 2015) (internal quotation marks omitted) (citing *Baird*, 662 F.3d at 1252); *see also Mason v. Geithner*, 811 F. Supp. 2d 128, 210 (2011) (granting summary judgment where plaintiff "compil[ed] a laundry list of employment actions and lump[ed] them together under the umbrella of a hostile work environment" without showing the actions to be "related in time or

type"). Here, the two actions upon which Plaintiff relies (the email from Tanner and the performance rating by Holland) are unrelated in time or type. They were taken by two different supervisors more than a month apart. Moreover, one action concerned leave policy and another concerned performance evaluation. The court finds no basis to conclude that they are part of the same unlawful employment practice. *Cf. Baird*, 662 F.3d at 1252; *Mason*, 811 F. Supp at 210.

Second, a reasonable trier of fact could not find that Tanner's action (emailing about the leave policy) and Holland's action (lowered performance evaluation) were "sufficiently severe or pervasive." Tanner's use of the phrase "perception of impropriety" does not rise to the level of blame and accusation. And the fact that Mitchell was copied does not increase the severity of the email, half of which was devoted to discussing the grievance issue with Plaintiff. Given her role in Human Resources, it is not surprising that Mitchell would be included in the message. At bottom, Tanner's email reflects the kind of work-related actions that courts routinely reject in hostile environment cases, *see Wade v. District of Columbia*, 780 F. Supp. 2d 1, 19 (2011) (collecting cases), even when the actions amount to "unjust criticism" or a "manufactured performance issue," *see, e.g.*, *id.*; *Richard v. Bell Atl. Corp.*, 209 F. Supp. 2d 23, 35 (D.D.C. 2002). The same is true of Holland's performance evaluation. Even if Holland lowered Plaintiff's performance evaluation for a retaliatory purpose, that is an insufficient basis for a hostile environment claim.

Third, Plaintiff's allegation against Holland is undermined by a lack of causal connection between Plaintiff's EEO activity and his performance evaluation. While the temporal proximity between Tanner's email and Tanner's acknowledgment of Plaintiff's EEO activity supports the causal connection for Tanner, *cf. Wade*, 780 F. Supp. 2d at 20, Plaintiff proffers no specific fact to establish a link between Holland's performance evaluation and Holland's awareness of

13

Plaintiff's EEO activity, let alone a causal link. In fact, Plaintiff has not shown that Holland even knew about his EEO activity.[4] Because Plaintiff's allegations fail to establish an actionable hostile environment claim based on retaliation, Defendant's motion for summary judgment on this claim will be GRANTED.

### C. Failure to Promote Based on Discrimination

Under *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), the plaintiff bears the burden of establishing a prima facie case of discrimination, which requires a showing that plaintiff is a member of a protected class and suffered from an adverse employment action that gives rise to an inference of discrimination. *See Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015). The burden then shifts to the defendant to establish a legitimate reason for the adverse action. *See Holcomb v. Powell*, 433 F.3d 889, 895–96 (D.C. Cir. 2006).

The D.C. Circuit has shifted away from the prima facie analysis, however, which it deems to be "almost always irrelevant" once the employer puts forth a legitimate reason for the action. *Patel v. Shinseki*, 930 F. Supp. 2d 116, 119 (D.D.C. 2013) (quoting *Brady v. Office of the Sgt. at Arms*, 520 F.3d 490, 493–94 (D.C. Cir. 2008). The central question, instead, is whether the employee has produced enough evidence for a reasonable jury to find that the "employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of [the protected class]." *See Patel*, 930 F. Supp. 2d at 119 (quoting *Brady*, 520 F.3d at 494); *see also Walker*, 798 F.3d at 1091. To establish liability under this analysis, a plaintiff may pursue a single-motive case by showing

---

[4] Plaintiff's allegation also fails to establish the requisite "but-for" causation required for retaliatory claims. *See Miles v. Kerry*, 961 F. Supp. 2d 272, 293 (D.D.C. 2013); *see also infra* Part III(D).

race was the sole reason for their non-selection, or they may pursue a mixed-motive case by showing that race was one of the factors for their non-selection. *See Washington v. Chao*, 577 F. Supp. 2d 27, 39 (D.D.C. 2008) (citing *Ginger v. District of Columbia*, 527 F.3d 1340, 1345 (D.C. Cir. 2008)). In evaluating a plaintiff's claim, the court reviews all categories of evidence—prima facie, pretext and any other. *See Jones*, 557 F.3d at 679; *Patel*, 830 F. Supp. 2d at 119.

Here, Plaintiff alleges that he was not selected for the MSO position because of his race. (Compl. ¶ 91.) He contends that he was more qualified than the selectee, Whitehurst, because he attended the Eisenhower School, had prior GS management experience, led a larger and more complex work unit, and because his former supervisor recommended him over Whitehurst. (*Id.* ¶¶ 60–63.) He also alleges that before he and Whitehurst attended the meet-and-greet, the selection official (Hurndon) walked Whitehurst through the office and introduced him to other employees as the new MSO. (*Id.* ¶ 58.)

1. <u>Legitimate Reason</u>

Defendant must show a legitimate, non-discriminatory reason for Plaintiff's non-selection. *See Kirshnan v. Foxx*, 177 F. Supp. 3d 496, 506 (D.D.C. 2016); *see also Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288–89 (D.C. Cir.1998) (en banc) (stating that the employer's burden is one of production, not persuasion). Evidence in the record shows that Plaintiff and Whitehurst tied for the highest score on the written portion of the application, but Whitehurst received the highest score in the interview process, while Plaintiff received the third-highest score. (*See* ECF No. 23-10 at 68; Def. MSJ at 11.) Whitehurst received higher scores than Plaintiff from each of the three interviewers, and for 12 of the 13 questions, and the same score

15

as Plaintiff for the one remaining question. (*See* ECF No. 23-10 at 69.) Inferior scores in an application scoring process is a legitimate reason for non-selection. *See Kirshnan v. Foxx*, 177 F. Supp. 3d 496, 506 (D.D.C. 2016). The court therefore finds that Defendant has satisfied its burden of production to show the existence of a legitimate, non-discriminatory reason for selecting another candidate.

2. Pretext

Because Defendant has asserted a nondiscriminatory reason for non-selection, the burden shifts to Plaintiff to show that the reason is pretextual. The question here is: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of [the protected characteristic]?" *Brady*, 520 F.3d at 494.

Plaintiff argues that the fact that he is white and that Hurndon, Akinselure, and Whitehurst are all black supports his racial discrimination claim. (*See* Compl. ¶ 57; Pl. Opp. at 34.) But this fact, standing alone, is insufficient to support a finding of pretextual discrimination, particularly when the two other interviewers who participated in the first-round interview by phone were both white, and gave Whitehurst higher scores. (*See* ECF No. 23-10 at 68; Def. MSJ at 5.)

Plaintiff argues bias in the selection process because Hurndon walked Whitehurst through the office before the December 8, 2016 meet-and-greet and introduced him to other employees as the new MSO. (*See* Compl. ¶ 58; ECF No. 24-10, at 18.) While Defendant denies that the event happened, even assuming it did, Plaintiff does not articulate how it supports his racial discrimination claim. Even if the court infers that Hurndon had already decided to select

16

Whitehurst *before* the second-round interview, it does not follow that that decision was a result of racial bias, especially given that at that point Whitehurst had higher scores than Plaintiff.

Similarly, Plaintiff provides insufficient evidence for his claim that he is "far superior" than the selectee. Summary judgment is properly granted if Plaintiff cannot provide enough evidence to show that he presents "stark superiority" over the selectee. *Stewart*, 353 F.3d at 429 (citing *Aka*, 156 F.3d at 1296); *Kirshnan*, 177 F. Supp. 3d at 506 (quoting *Singleton v. Potter*, 402 F. Supp. 2d 12, 31 (D.D.C. 2005) ("Discrimination will not be inferred from a comparison of candidate qualifications absent a showing that plaintiff's qualifications were *far superior* to the successful candidate's.") (emphasis in original).

Plaintiff argues that too much weight was given to the application and interview, at the expense of considering his qualifications. But defendant set up a two-round interview process to evaluate the candidates' qualifications and thus it is reasonable to infer that Defendant found the interviews to be an important part of its evaluation of the candidates' qualifications. Given that inference, the court will not "second guess an employer's personnel decision" in conducting the selection process. *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996). Because interviews were evidently a central part of the evaluative process, and because the selectee did better in the initial interview than Plaintiff, Plaintiff's claim that he is "far superior" than the other candidates lacks merit.

Because Plaintiff identifies no concrete discriminatory pretext, the court will GRANT Defendant's motion for summary judgment with respect to this claim.

### D. Removal from Supervisory Authority Based on Retaliation

In a retaliation claim, "the plaintiff generally must establish that he or she suffered (i) a materially adverse action (ii) because he or she had brought or threatened to bring a discrimination claim." *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008). Unlike a discrimination claim under Title VII, however, "Title VII retaliation claims ultimately require proof that the desire to retaliate was the 'but-for' cause of the challenged action." *Miles v. Kerry*, 961 F. Supp. 2d 272, 293 (D.D.C. 2013) (citing *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

Here, the first prong is easily met. There is no dispute that Plaintiff lost his supervisory role after he was reassigned from LDD to HLTI, (*see* Def. MSJ at 9; Compl. ¶ 95), and "withdrawing an employee's supervisory duties constitutes an adverse employment action." *Stewart*, 352 F.3d at 427 (citing *Burke v. Gould*, 286 F.3d 513, 522 (D.C. Cir. 2002)).

The second prong, however, is not met. Plaintiff argues that Defendant removed his supervisory authority in retaliation for his EEO activities. (*See* Pl. Opp. at 36–38.) But there is no evidence in the record suggesting that Plaintiff's EEO activities were the but-for cause. To the contrary, the record indicates that Plaintiff lost his supervisory authority due to a structural reorganization, which included the removal of not just his position but two others as well.[5] (Def. MSJ at 14.) In addition, the record does not suggest that Pellum or Tanner ordered, proposed, or initiated the reassignment. In light of the lack of evidentiary support for Plaintiff's assertions, Defendant's motion for summary judgment with respect to this claim will be GRANTED.

---

[5] To the extent that Plaintiff is arguing that the reassignment of the positions itself was retaliatory, he has provided no support for this argument, and the court need not address it.

## IV. CONCLUSION

For the reasons set forth above, the Defendant's motion for summary judgment will be GRANTED in full.

A corresponding Order will issue separately.

Date: April 12, 2020

*Tanya S. Chutkan*
_____
TANYA S. CHUTKAN
United States District Judge